UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

LINDA S.,[1]

        Plaintiff,

        v.

MARTIN O'MALLEY,
Commissioner of Social Security,

        Defendant.

                         Case No. 1:22-cv-3840
                         Magistrate Judge Norah McCann King

**OPINION AND ORDER**

This matter comes before the Court pursuant to Section 205(g) of the Social Security Act, as amended, 42 U.S.C. § 405(g), regarding the applications of Plaintiff Linda S. for Disability Insurance Benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401 *et seq.*, and for Supplemental Security Income under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381 *et seq.* Plaintiff appeals from the final decision of the Commissioner of Social Security denying those applications.[2] After careful consideration of the entire record, including the entire administrative record, the Court decides this matter pursuant to Rule 78(b) of the Federal Rules of Civil Procedure. For the reasons that follow, the Court affirms the Commissioner's decision.

## I.    PROCEDURAL HISTORY

On April 16, 2019, Plaintiff filed applications for disability insurance benefits and supplemental security income, alleging that she has been disabled since November 1, 2018. R.

---

[1] The Committee on Court Administration and Case Management of the Judicial Conference of the United States has recommended that, due to significant privacy concerns in social security cases, federal courts should refer to plaintiffs in such cases by only their first names and last initials. *See also* D.N.J. Standing Order 2021-10.

[2] Martin O'Malley, the current Commissioner of Social Security, is substituted as Defendant in his official capacity.

1

102–03, 142–43, 247–58. The applications were denied initially and upon reconsideration. R.

150–63, 167–69. Plaintiff sought a *de novo* hearing before an administrative law judge ("ALJ").

R. 170. ALJ Dale Black-Pennington held a hearing on January 6, 2021, at which Plaintiff, who

was represented by counsel, testified, as did a vocational expert. R. 41–79. In a decision dated

January 28, 2021, the ALJ concluded that Plaintiff was not disabled within the meaning of the

Social Security Act from November 1, 2018, Plaintiff's alleged disability onset date, through the

date of that decision. R. 22–36. That decision became final when the Appeals Council declined

review on February 11, 2022. R. 8–13. Plaintiff timely filed this appeal pursuant to 42 U.S.C. §

405(g). ECF No. 1. On April 17, 2023, Plaintiff consented to disposition of the matter by a

United States Magistrate Judge pursuant to 28 U.S.C. § 636(c) and Rule 73 of the Federal Rules

of Civil Procedure. ECF No. 12.[3] On April 18, 2023, the case was reassigned to the undersigned.

ECF No. 13. The matter is ripe for disposition.

## II.   LEGAL STANDARD

### A.   Standard of Review

In reviewing applications for Social Security disability benefits, this Court has the

authority to conduct a plenary review of legal issues decided by the ALJ. *Knepp v. Apfel*, 204

F.3d 78, 83 (3d Cir. 2000).  In contrast, the Court reviews the ALJ's factual findings to

determine if they are supported by substantial evidence. *Sykes v. Apfel*, 228 F.3d 259, 262 (3d

Cir. 2000); *see also* 42 U.S.C. §§ 405(g), 1383(c)(3). The United States Supreme Court has

explained this standard as follows:

> Under the substantial-evidence standard, a court looks to an existing administrative
> record and asks whether it contains sufficien[t] evidence to support the agency's

---

[3]The Commissioner has provided general consent to Magistrate Judge jurisdiction in cases
seeking review of the Commissioner's decision. *See* Standing Order In re: Social Security Pilot
Project (D.N.J. Apr. 2, 2018).

factual determinations. And whatever the meaning of substantial in other contexts, the threshold for such evidentiary sufficiency is not high. Substantial evidence, this Court has said, is more than a mere scintilla. It means – and means only – such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.

*Biestek v. Berryhill*, 587 U.S. ----, 139 S.Ct. 1148, 1154 (2019) (internal citations and quotation marks omitted); *see also Pierce v. Underwood*, 487 U.S. 552, 565 (1988) (citation and internal quotations omitted); *Bailey v. Comm'r of Soc. Sec.*, 354 F. App'x 613, 616 (3d Cir. 2009) (citations and quotations omitted); *K.K. ex rel. K.S. v. Comm'r of Soc. Sec.*, No. 17-2309, 2018 WL 1509091, at *4 (D.N.J. Mar. 27, 2018).

The substantial evidence standard is a deferential standard, and the ALJ's decision cannot be set aside merely because the Court "acting de novo might have reached a different conclusion." *Hunter Douglas, Inc. v. NLRB*, 804 F.2d 808, 812 (3d Cir. 1986); *see, e.g.*, *Fargnoli v. Massanari*, 247 F.3d 34, 38 (3d Cir. 2001) ("Where the ALJ's findings of fact are supported by substantial evidence, we are bound by those findings, even if we would have decided the factual inquiry differently.") (citing *Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir. 1999)); *K.K.*, 2018 WL 1509091, at *4 ("'[T]he district court ... is [not] empowered to weigh the evidence or substitute its conclusions for those of the fact-finder.'") (quoting *Williams v. Sullivan*, 970 F.2d 1178, 1182 (3d Cir. 1992)).

Nevertheless, the Third Circuit cautions that this standard of review is not "a talismanic or self-executing formula for adjudication." *Kent v. Schweiker*, 710 F.2d 110, 114 (3d Cir. 1983) ("The search for substantial evidence is thus a qualitative exercise without which our review of social security disability cases ceases to be merely deferential and becomes instead a sham."); *see Coleman v. Comm'r of Soc. Sec.*, No. 15-6484, 2016 WL 4212102, at *3 (D.N.J. Aug. 9, 2016). The Court has a duty to "review the evidence in its totality" and "take into account

3

whatever in the record fairly detracts from its weight." *K.K.*, 2018 WL 1509091, at *4 (quoting *Schonewolf v. Callahan*, 972 F. Supp. 277, 284 (D.N.J. 1997) (citations and quotations omitted)); *see Cotter v. Harris*, 642 F.2d 700, 706 (3d Cir. 1981) (stating that substantial evidence exists only "in relationship to all the other evidence in the record"). Evidence is not substantial if "it is overwhelmed by other evidence," "really constitutes not evidence but mere conclusion," or "ignores, or fails to resolve, a conflict created by countervailing evidence." *Wallace v. Sec'y of Health & Human Servs.*, 722 F.2d 1150, 1153 (3d Cir. 1983) (citing *Kent*, 710 F.2d at 114); *see K.K.*, 2018 WL 1509091, at *4. The ALJ's decision thus must be set aside if it "did not take into account the entire record or failed to resolve an evidentiary conflict." *Schonewolf*, 972 F. Supp. at 284-85 (citing *Gober v. Matthews*, 574 F.2d 772, 776 (3d Cir. 1978)).

Although an ALJ is not required "to use particular language or adhere to a particular format in conducting [the] analysis," the decision must contain "sufficient development of the record and explanation of findings to permit meaningful review." *Jones v. Barnhart*, 364 F.3d 501, 505 (3d Cir. 2004) (citing *Burnett v. Comm'r of Soc. Sec.*, 220 F.3d 112, 119 (3d Cir. 2000)); *see K.K.*, 2018 WL 1509091, at *4. The Court "need[s] from the ALJ not only an expression of the evidence s/he considered which supports the result, but also some indication of the evidence which was rejected." *Cotter*, 642 F.2d at 705-06; *see Burnett*, 220 F.3d at 121 ("Although the ALJ may weigh the credibility of the evidence, [s/]he must give some indication of the evidence which [s/]he rejects and [the] reason(s) for discounting such evidence.") (citing *Plummer v. Apfel*, 186 F.3d 422, 429 (3d. Cir. 1999)). "[T]he ALJ is not required to supply a comprehensive explanation for the rejection of evidence; in most cases, a sentence or short paragraph would probably suffice." *Cotter v. Harris*, 650 F.2d 481, 482 (3d Cir. 1981). Absent

such articulation, the Court "cannot tell if significant probative evidence was not credited or simply ignored." *Id.* at 705. As the Third Circuit explains:

> Unless the [ALJ] has analyzed all evidence and has sufficiently explained the weight [s/]he has given to obviously probative exhibits, to say that [the] decision is supported by substantial evidence approaches an abdication of the court's duty to scrutinize the record as a whole to determine whether the conclusions reached are rational.

*Gober*, 574 F.2d at 776; *see Schonewolf*, 972 F. Supp. at 284-85.

Following review of the entire record on appeal from a denial of benefits, the Court can enter "a judgment affirming, modifying, or reversing the decision of the [Commissioner], with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). Remand is appropriate if the record is incomplete or if the ALJ's decision lacks adequate reasoning or contains illogical or contradictory findings. *See Burnett*, 220 F.3d at 119-20; *Podedworny v. Harris*, 745 F.2d 210, 221-22 (3d Cir. 1984). Remand is also appropriate if the ALJ's findings are not the product of a complete review which "explicitly weigh[s] all relevant, probative and available evidence" in the record. *Adorno v. Shalala*, 40 F.3d 43, 48 (3d Cir. 1994) (internal quotation marks omitted); *see A.B. on Behalf of Y.F. v. Colvin*, 166 F. Supp.3d 512, 518 (D.N.J. 2016).

### B. Sequential Evaluation Process

The Social Security Act establishes a five-step sequential evaluation process for determining whether a plaintiff is disabled within the meaning of the statute. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). "The claimant bears the burden of proof at steps one through four, and the Commissioner bears the burden of proof at step five." *Smith v. Comm'r of Soc. Sec.*, 631 F.3d 632, 634 (3d Cir. 2010) (citing *Poulos v. Comm'r of Soc. Sec.*, 474 F.3d 88, 92 (3d Cir. 2007)).

At step one, the ALJ determines whether the plaintiff is currently engaged in substantial gainful activity. 20 C.F.R. §§ 404.1520(b), 416.920(b).  If so, then the inquiry ends because the plaintiff is not disabled.

At step two, the ALJ decides whether the plaintiff has a "severe impairment" or combination of impairments that "significantly limits [the plaintiff's] physical or mental ability to do basic work activities[.]" 20 C.F.R. §§ 404.1520(c), 416.920(c). If the plaintiff does not have a severe impairment or combination of impairments, then the inquiry ends because the plaintiff is not disabled.  Otherwise, the ALJ proceeds to step three.

At step three, the ALJ decides whether the plaintiff's impairment or combination of impairments "meets" or "medically equals" the severity of an impairment in the Listing of Impairments ("Listing") found at 20 C.F.R. § 404, Subpart P, Appendix 1. 20 C.F.R. §§ 404.1520(d), 416.920(d). If so, then the plaintiff is presumed to be disabled if the impairment or combination of impairments has lasted or is expected to last for a continuous period of at least 12 months. *Id*. at §§ 404.1509, 416.909. Otherwise, the ALJ proceeds to step four.

At step four, the ALJ must determine the plaintiff's residual functional capacity ("RFC") and determine whether the plaintiff can perform past relevant work. 20 C.F.R. §§ 404.1520(e), (f), 416.920(e), (f). If the plaintiff can perform past relevant work, then the inquiry ends because the plaintiff is not disabled. Otherwise, the ALJ proceeds to the final step.

At step five, the ALJ must decide whether the plaintiff, considering the plaintiff's RFC, age, education, and work experience, can perform other jobs that exist in significant numbers in the national economy. 20 C.F.R. §§ 404.1520(g), 416.920(g). If the ALJ determines that the plaintiff can do so, then the plaintiff is not disabled. Otherwise, the plaintiff is presumed to be

disabled if the impairment or combination of impairments has lasted or is expected to last for a continuous period of at least twelve months.

## III.    ALJ DECISION AND APPELLATE ISSUES

Plaintiff was 50 years old on her alleged disability onset date. R. 34. She met the insured status requirements of the Social Security Act through September 30, 2023. R. 24. At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity between November 1, 2018, her alleged disability onset date, and the date of the decision. *Id.*

At step two, the ALJ found that Plaintiff's cardiovascular disorders were severe impairments. *Id.* The ALJ also found that the following conditions were not severe: vitamin D deficiency; cysts; irritable bowel syndrome; low back pain with radiculopathy; obesity; adjustment disorder with mixed anxiety and depressed moods; insomnia; generalized anxiety disorder; and depressive disorder. R. 26–30.

At step three, the ALJ found that Plaintiff did not suffer an impairment or combination of impairments that met or medically equaled the severity of any Listing. R. 29.

At step four, the ALJ found that Plaintiff had the RFC to perform sedentary work subject to various additional limitations. R. 29–34. The ALJ also found that this RFC did not permit the performance of Plaintiff's past relevant work as a property manager. R. 34.

At step five and relying on the testimony of the vocational expert, the ALJ found that a significant number of jobs—*e.g.*, jobs as a data entry clerk, a procurement clerk, and an accounting clerk—existed in the national economy and could be performed by Plaintiff despite her lessened capacity. R. 35–36. The ALJ therefore concluded that Plaintiff was not disabled within the meaning of the Social Security Act from November 1, 2018, her alleged disability onset date, through the date of the decision. R. 36.

Plaintiff disagrees with the ALJ's findings at steps four and five and asks that the decision of the Commissioner be reversed and remanded with directions for the granting of benefits or, alternatively, for further proceedings. *Plaintiff's Memorandum of Law,* ECF No. 8; *Plaintiff's Reply Brief*, ECF No. 11. The Commissioner takes the position that his decision should be affirmed in its entirety because the ALJ's decision correctly applied the governing legal standards, reflected consideration of the entire record, and was supported by sufficient explanation and substantial evidence. *Defendant's Brief Pursuant to Local Civil Rule 9.1*, ECF No. 9.

## IV.    SUMMARY OF RELEVANT MEDICAL EVIDENCE

### A.    Juan Carlos Cornejo, D.O.

On October 11, 2019, Juan Carlos Cornejo, D.O., conducted a consultative examination of Plaintiff. R. 662–72 ("Dr. Cornejo's opinion"). Dr. Cornejo noted that Plaintiff alleged disability based on congestive heart failure ("CHF") and hypertension. R. 662. Plaintiff denied chest pain and stated that she was currently seeing a cardiologist. R. 662–63. Her reported activities of daily living consisted of goint to a store or office by herself or with someone else, doing laundry but not light house cleaning making simple meals and feeding herself dressing herself, including putting on and taking off her shoes, brushing her teeth, and taking a shower or bath. R. 663. She had a valid driver's license and drove. R. 664. She reported that she could climb up and down a few steps and walk one block. *Id*. Dr. Cornejo observed that Plaintiff was in no acute distress, was able to get on and off the examining table, could dress herself, and was comfortable in a seated position. *Id*. A cardiac exam revealed "regular rate and sinus rhythm. S1 and S2. No murmurs, gallop, or rubs are appreciated. Carotid, Radial Pulses, Dorsalis Ped is, and Posterior Tibialis pulses are +2 bilaterally;" a pulmonary exam showed that her lungs were "clear

8

to auscultation and percussion bilaterally without rales, rhonchi, wheezing, or coughs." *Id*. Dr.

Cornejo also made the following findings:

### MUSCULOSKELETAL/NEUROLOGICAL

#### Upper Extremities
Evaluation of the upper extremities showed full range of motion of the shoulders, elbows, wrists, and hands bilaterally. The sensory examination was intact throughout the upper extremities in pinprick and light touch. Biceps, triceps, and brachioradialis deep tendon reflexes were 2+ bilaterally symmetric. Pinch strength and grip strength were 5/5 bilaterally. Muscle strength of the upper extremities, including the biceps and triceps, were graded at 5/5 bilaterally. The claimant was able to extend [her] fingers, make a fist, and oppose the thumbs bilaterally.

#### Lower Extremities
Evaluation of the lower extremities showed full range of motion of the hips, knees, and ankles bilaterally. Muscle strength was 5/5 in the lower extremities in hip flexion, leg flexion, leg extension, ankle dorsiflexion, and ankle plantar flexion bilaterally. Patella and Achilles deep tendon reflexes were 2+ bilaterally symmetric. The sensory examination was intact throughout the lower extremities in pinprick and light touch.

#### Cervical Spine
Evaluation of the cervical spine showed full range of motion in flexion, extension, side-bending, and rotation. There was no significant cervical, para-cervical, or trapezium tenderness or spasm. The cervical spine showed a normal lordotic curve.

#### Lumbar Spine
Evaluation of the lumbosacral spine showed full range of motion in flexion, extension, side-bending, and rotation. There was no significant lumbar, paralumbar, spinous process tenderness or spasm. The lumbar spine showed a normal lordotic curve. There was no lower back pain or radicular symptoms on sitting straight leg raising maneuver. There was no lower back pain or radicular symptoms on supine straight leg raising maneuver.

#### GAIT
The examinee was able to walk with a normal physiologic gait. She did not require the use of an ambulation aide. The examinee was able to heel walk, toe walk, and squat without difficulty. Hand-eye coordination was good.

#### Speech Evaluation
Speech is clear and coherent. Thought process was goal directed. The examinee's comprehension and repetition functions were intact. There was no aphasia, stuttering, or involuntary vocalizations.

9

**Mental Evaluation**
The examinee is awake, alert, and oriented to time, place, and person. The claimant was cooperative during the examination. The examinee was able to answer questions without difficulty. Mood and affect are normal. Concentration was normal. There was no significant abnormality with thought processing and thought content. Short-term memory is intact with 3/3 objects recalled after 5 minutes. Long-term memory is intact. She was able to recall the name of her high school and date of birth.

R. 665–66. X-rays of the lumbar spine showed degenerative disc disease. R. 666 (copy attached to opinion at R. 671). "EKG showed pacemaker rhythm, HR: 57, PR, 166." *Id*. (copy of results attached to opinion at R. 670). Dr. Cornejo diagnosed congestive heart failure, hypertension, and lumbar degenerative disc disease, noting as follows:

In regards to her CHF, she was diagnosed with CHF since 2015. Her ejection fracture was 30-35%, per her report. Medical records were not available for review. EKG did show pacemaker rhythm. She denies chest pain. Her blood pressure was 142/90.

In regards to her hypertension, she was diagnosed with hypertension since 2000. She denies chest pain. She was in no acute cardiac or respiratory distress. Her blood pressure was 142/90, HR 69, pulse ox 96%. She was in no significant fatigue during the range of motion maneuver or muscle strength testing.

She has good fine and gross manipulation. There was no significant impairment in gait, station, or ambulation.

*Id*. Under the portion of his opinion entitled "Passive Range of Motion Chart," Dr. Cornejo noted that Plaintiff could fully extend her hands, make a fist, oppose her fingers, separate papers, and button buttons; she had full pinch and grip strength in her hands/fingers. R. 668. Plaintiff had negative straight leg raising tests in both the sitting and supine positions. R. 669. She was able to squat, walk on her heels and toes, and had no sensory or reflex loss. *Id*. She had 5/5 muscle strength in her legs and could walk at a reasonable pace without a hand-held device. *Id*.

Dr. Cornejo opined as follows:

*She would not be limited from walking and standing with reasonable breaks. She would be able to sit for a reasonable amount time with needed breaks.* No

significant balance limitations were observed during the evaluation. She has good functionality of her right and left hands. She would be able to handle fine and small sized objects. She has no significant limitations to fingering such as picking and pinching objects. She would have difficulty with physically exerting activity. She would have difficulty with heavy lifting. *However, she would be able to do sedentary activity with needed breaks.*

*Id*. (emphasis added).

### B.    Lewis A. Lazarus, M.D.

On October 16, 2019, Lewis A. Lazarus, M.D., a clinical neuropsychologist, conducted a consultative examination of Plaintiff. R. 673–76. According to Plaintiff, "she last worked in March of 2016 as an assistant property manager. She stated that she did that for about 30 years and stopped after there was a new owner and she was let go." R. 673. She denied inpatient hospitalization but reported that, six years previously, she had seen a therapist because of issues with her boyfriend. *Id.* She was not undergoing any mental health treatment at the time of the examination. *Id*. Plaintiff reported feeling "extremely dysphoric and sad for the past few years with her medical issues and job problems as well as her mother's deteriorating condition. She noted feeling hopeless, worthless, and extremely fatigued," but denied any recurrent thoughts of death or suicide. R. 674. Her "[s]leep has been marked by difficulties falling and staying asleep." *Id*. She reported "panic symptoms of shakiness, chest pain, and the feeling of choking as well as some shortness of breath. She stated these episodes do not occur very often. There was no evidence of any manic symptoms or disturbances in thought processes such as hallucinations or delusions. Cognitively, she complained of recent memory difficulties." *Id*. Upon examination, Dr. Lazarus noted as follows:

**MENTAL STATUS EXAMINATION:**
The claimant presented to this examination with a cooperative and friendly demeanor. Her manner of relating and social skills were adequate. She appeared generally in accord with her stated age. She was appropriately, neatly and casually dressed. She was adequately groomed. She utilized no prosthetic devices for vision,

hearing or ambulation. She related that she has had LASIK surgery to both eyes. Gait, posture, and motor behavior were all normal and eye contact was appropriate. Speech was fluent and clear with adequate expressive and receptive language functions. Thought processes were coherent and goal directed with no evidence of any hallucinations, delusions, or paranoia in the evaluation setting. Affect was dysphoric and mood was described as being "Okay so far but a little nervous."

She was noted to be alert and oriented in all spheres including knowing the current President of the United States. *Recent and remote memory skills were considered to be mildly compromised in terms of recent memory and new learning with difficulties in the retrieval of recently-acquired information.* She was able to immediately recall 3/3 items but just 1/3 items was recalled after a brief 5-10 minute delay. The presentation of a semantic cue, however, improved her recall to 3/3. *Attention and concentration were considered to be fair.* She could do simplistic calculations as well as serial 3s generally adequately. She was able to repeat 6 digits forward but just 3 digits in the reverse order on a digit span task. *Intellectually, she is estimated to have been functioning in the average range with an average general fund of knowledge. Insight and judgment are both considered to be fair to good.*

**ACTIVITIES OF DAILY LIVING:**
*The claimant stated she is independent with dressing, bathing and grooming. She can cook and prepare some basic foods. She stated that she struggles in getting out of breath and fatigued easily.* She does not typically shop and has no money to manage but can manage her medications and drive. She stated that she does have friends and she does keep in touch with them. She is close with her sisters and her father. She stated that she enjoys reading, watching television, and in the past had liked to exercise. A typical day now is spent getting up, bathing, taking her medications, eating, reading, trying to do something around her home, and usually she is at home all the time.

Overall, the examination results are considered to be consistent with the claimant's allegations.

*Id*. (emphasis added). Dr. Lazarus diagnosed adjustment disorder with mixed anxiety and

depressed moods, chronic; history of cardiomyopathy, congestive heart failure, and pulmonary

stenosis; and "[p]roblems with vocational functioning." *Id*.

The recommendations at this time are certainly for individual psychological counseling in order to assist the claimant in improving her coping and adjustment with her current circumstances. Medical followup is also strongly recommended in order to assist the claimant in dealing with her underlying medical issues, particularly her cardiac disease. The claimant indicated that she has never had cardiac rehabilitation. *Vocational assessment and rehabilitation may be somewhat problematic because of her underlying medical issues predominantly.*

*Id.* (emphasis added). Plaintiff's prognosis was "[f]air to guarded and largely dependent upon her underlying medical issues." R. 675.

## V.    DISCUSSION

### A.    RFC and Opinion Evidence

Plaintiff argues that substantial evidence does not support the ALJ's RFC determination of a limited range of sedentary work because the ALJ failed to properly consider the opinions of Drs. Cornejo and Lazarus, as well as "all of the symptoms stemming from both the Plaintiff's severe and nonsevere impairments[.]" *Plaintiff's Memorandum of Law*, ECF No. 8, pp. 17–28; *Plaintiff's Reply Brief*, ECF No. 11, pp. 3–4. For the reasons that follow, Plaintiff's arguments are not well taken.

A claimant's RFC is the most that the claimant can do despite her limitations. 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1). At the administrative hearing stage, it is the ALJ who is charged with determining the claimant's RFC. 20 C.F.R. §§ 404.1546(c), 416.946(c); *see also Chandler v. Comm'r of Soc. Sec.*, 667 F.3d 356, 361 (3d Cir. 2011) ("The ALJ—not treating or examining physicians or State agency consultants—must make the ultimate disability and RFC determinations.") (citations omitted). When determining a claimant's RFC, the ALJ has a duty to consider all the evidence. *Plummer v. Apfel*, 186 F.3d 422, 429 (3d Cir. 1999). However, the ALJ need include only "credibly established" limitations. *Rutherford v. Barnhart*, 399 F.3d 546, 554 (3d Cir. 2005); *see also Zirnsak v. Colvin*, 777 F.3d 607, 615 (3d Cir. 2014) (stating that the ALJ has discretion to choose whether to include "a limitation [that] is supported by medical evidence, but is opposed by other evidence in the record" but "[t]his discretion is not unfettered—the ALJ cannot reject evidence of a limitation for an unsupported reason" and stating that "the ALJ also

has the discretion to include a limitation that is not supported by any medical evidence if the ALJ

finds the impairment otherwise credible").

In the case presently before the Court, the ALJ determined that Plaintiff had the RFC to

perform a limited range of sedentary work:

> After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) except can lift and/or carry 10 pounds occasionally and less than 10 pounds frequently; able to stand and/or walk for two hours and sit for six hours in an eight-hour workday; requires ability to change positions for comfort without being off task; must avoid exposure to heavy machinery, unprotected heights and industrial vibrations; able to occasionally climb ramps and/or stairs, crouch, kneel and crawl; and able to frequently balance and reach in all directions.

R. 29. In making this determination, the ALJ detailed years of record evidence, including, *inter*

*alia*, Plaintiff's testimony that she could not climb steps without having to stop, could not sit for

prolonged periods, was unable to exercise, had difficulty sleeping more than four hours per

night, awakening every hour, had to sleep sitting up, relied on her daughter to blow-dry

Plaintiff's hair and on her boyfriend for grocery shopping and doing the cooking, could not walk

or stand for more than 10 minutes before her ankles started swelling, needed to elevate her legs

due to swelling and numbness, had problems with reaching due to pacemaker battery and

fatigue; that she could drive without any limitation, could read, write and do math, could care for

her daily personal needs, did dishes, light dusting and laundry with assistance from her daughter;

Plaintiff's history of congenital pulmonic valve stenosis, diagnosed at age 2, and history of

cardiac catheterizations without interventions; her history of essential hypertension,

hypokalemia, vasovagal syncope, nonischemic cardiomyopathy, left bundle branch block and

premature ventricular contractions; Plaintiff's report in February 2018 of tolerating her cardiac

medications without side effects, no further episodes of syncope, good exercise tolerance and

14

resumption of all normal activities, including shopping; her denial of any exertional chest discomfort, shortness of breath, palpitations or ankle swelling; the report that Plaintiff's cardiomyopathy appeared stable, her left bundle branch block was unchanged, her cardiac murmurs were consistent with pulmonic valve stenosis and she tolerated her medications; evidence that, in April 2018, Plaintiff underwent biventricular implantable cardioverter-defibrillator ("ICD") implantation, secondary to severe left ventricular ("LV") dysfunction and abnormal ECG; Plaintiff's report in July 2018 that she was feeling well without new symptoms and her attributing her complaints of fatigue to her poor sleep pattern; she denied dyspnea, chest discomfort, dizziness, syncope, and ankle swelling and was able to walk up to four miles in one hour with good walking tolerance; evidence that a December 2018 cardiology check up included findings of a history of vasovagal syncope, mild congenital pulmonic valve disease, and nonischemic cardiomyopathy with an ejection fraction at 30 to 35% on optimal medical therapy, left bundle branch block status-post biventricular ICD implantation with a normal functioning device; Plaintiff's report in December 2018 that she did not feel short of breath when shopping, rarely felt palpitations without any dizziness or near syncope, and denied any orthopnea or chest pain; examination findings of blood pressure of 130/90, no distress and a healthy appearance, fully alert and oriented, a murmur graded 6, but otherwise normal cardiovascular findings with a normal rate and rhythm, normal breath sounds, and no edema; a diagnosis of nonischemic dilated cardiomyopathy; and an echocardiogram showing no improvement in LV function, but no overt signs of fluid retention or heart failure decompensation; Plaintiff's report in March 2019 of chronic fatigue and tiring after 15 minutes of exercise, but she denied chest pain, palpitations, dizziness, leg swelling, syncope or ICD shocks, and she remained stable in regards to her nonischemic cardiomyopathy, but symptomatic with reduced exercise capacity; her failure to

15

follow up with primary care between February 21018 and April 2019, although she regularly followed up with cardiology for nonischemic cardiomyopathy, which remained relatively well compensated without chest pain, palpitations, or leg swelling; a review of systems showing negative depression, negative back pain, and negative joint pain, without evidence of edema; a June 2019 device check showing continued normal functioning of the ICD device and Plaintiff reported no complaints; a July 2019 cardiology follow-up at which Plaintiff reported feeling well and denied any cardiac symptoms, dizziness, shocks from the device, near syncope, palpitations, shortness of breath, leg swelling, chest pain or claudication, and reported a normal/good physical activity tolerance; examination findings that Plaintiff's nonischemic cardiomyopathy was stable with normal tolerance for physical activity and without symptoms of heart failure or arrhythmia; Plaintiff's report in January 2020 of being stable overall with some shortness of breath upon physical activity, that she was able to exercise for 45 minutes and could climb stairs without restriction, and she continued to deny chest pain, palpitations, ICD shocks, orthopnea, leg swelling or claudication; findings of a blood pressure reading of 160/96, but that she otherwise appeared healthy, without distress and that she showed normal cardiovascular rate and rhythm with occasional extrasystoles and murmur graded 6, no edema, normal pulses and Plaintiff was fully alert and oriented; findings upon testing that showed atrial-sensed ventricular-paced rhythm with occasional AV dual-paced complexes, occasional premature ventricular complexes and ECG compared with prior study showed ventricular rate decreased by 13 bpm; findings that Plaintiff was stable as to her nonischemic cardiomyopathy and that signs and symptoms of heart failure were well compensated; diagnoses of nonischemic cardiomyopathy, congenital pulmonic valve stenosis, premature ventricular contractions, chronic systolic heart failure and elevated blood pressure; an ICD device check in February 2020 that revealed two episodes of non-

16

sustained ventricular tachycardia ("NSVT"), but Plaintiff reported no complaints; a biventricular

ICD device check in October 2020 that showed NSVT in short duration and Plaintiff was

asymptomatic. R. 30–32. The ALJ explained the RFC determination for a limited range of

sedentary work as follows:

> Based on the foregoing, the undersigned finds the claimant has the above residual
> functional capacity assessment, which is supported by treatment records, objective
> clinical findings and the claimant's ability to perform more than a wide range of
> adequate activities of daily living. Although the claimant has received treatment for
> the allegedly disabling symptoms, which would normally weigh somewhat in the
> claimant's favor, the record also reveals that the treatment has been generally
> successful in controlling those symptoms. In fact, most recent cardiovascular
> treatment records, on January 2, 2020, the claimant reported overall stable and
> despite complaints of somewhat shortness of breath with physical activity, this did
> not stop her, and able to exercise for 45 minutes and able to climb stairs without
> restriction. She continued to deny any chest pain, palpitations, ICD shocks,
> orthopnea, leg swelling or claudication (Exhibit 10F, p. 164). She appeared healthy,
> no distress and showed normal cardiovascular rate and rhythm with occasional
> extrasystoles and murmur graded 6. However, no edema, normal pulses and fully
> alert and oriented (Id., 165-166). In addition, office visit notes reflect occasions,
> which the claimant did not specify any particular complaint, which contrasts with
> the current claim of ongoing, disabling symptoms since the alleged onset date.

R. 33–34. In the view of this Court, this record contains substantial evidence to support the

ALJ's RFC determination. *See Zirnsak*, 777 F.3d at 615; *Rutherford*, 399 F.3d at 554; *Plummer*,

186 F.3d at 429.

However, Plaintiff challenges the ALJ's RFC determination, arguing that the ALJ erred

in his consideration of the opinions of Dr. Cornejo and Dr. Lazarus. *Plaintiff's Memorandum of

Law*, ECF No. 8, pp. 17–21; *Plaintiff's Reply Brief*, ECF No. 11, pp. 3–4. This Court disagrees.

The ALJ must evaluate all record evidence in making a disability determination.

*Plummer,* 186 F.3d at 433; *Cotter,* 642 F.2d at 704. The ALJ's decision must include "a clear

and satisfactory explication of the basis on which it rests," sufficient to enable a reviewing court

"to perform its statutory function of judicial review." *Cotter*, 642 F.2d at 704–05. Specifically,

the ALJ must discuss the evidence that supports the decision, the evidence that the ALJ rejected, and explain why the ALJ accepted some evidence but rejected other evidence. *Id*. at 705–06; *Diaz v. Comm'r of Soc. Sec.*, 577 F.3d 500, 505–06 (3d Cir. 2009); *Fargnoli v. Massanari*, 247 F.3d 34, 42 (3d Cir. 2001) ("Although we do not expect the ALJ to make reference to every relevant treatment note in a case . . . we do expect the ALJ, as the factfinder, to consider and evaluate the medical evidence in the record consistent with his responsibilities under the regulations and case law."). Without this explanation, "the reviewing court cannot tell if significant probative evidence was not credited or simply ignored." *Cotter*, 642 F.2d at 705; *see also Burnett,* 220 F.3d at 121 (citing *Cotter*, 642 F.2d at 705).

For claims filed after March 27, 2017,[4] the regulations eliminated the hierarchy of medical source opinions that gave preference to treating sources. *Compare* 20 C.F.R. §§ 404.1527, 416.927 *with* 20 C.F.R. §§ 404.1520c(a), 416.927c(a) (providing, *inter alia*, that the Commissioner will no longer "defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from [the claimant's] medical sources"). Instead, the Commissioner will consider the following factors when considering all medical opinions: (1) supportability; (2) consistency; (3) relationship with the claimant, including the length of the treating examination, the frequency of examinations, and the purpose of the treatment relationship; (4) the medical source's specialization; and (5) other factors, including, but not limited to, "evidence showing a medical source has familiarity with the other evidence in the claim or an understanding of our disability program's policies and evidentiary requirements." 20 C.F.R. §§ 404.1520c(c), 416.920c(c).

---

[4] As previously noted, Plaintiff's claims were filed on April 16, 2019.

The regulations emphasize that "the most important factors [that the ALJ and Commissioner] consider when [] evaluat[ing] the persuasiveness of medical opinions and prior administrative medical findings are supportability (paragraph (c)(1) of this section) and consistency (paragraph (c)(2) of this section)." *Id*. at §§ 404.1520c(a), 416.920c(a). As to the supportability factor, the regulations provide that "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be." *Id*. at §§ 404.1520c(c)(1), 416.920c(c)(1).  As to the consistency factor, the regulations provide that "[t]he more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be." *Id*. at §§ 404.1520c(c)(2), 416.920c(c)(2).

The applicable regulations further require the ALJ to articulate his or her "consideration of medical opinions and prior administrative medical findings" and articulate in the "determination or decision how persuasive [he or she] find[s] all of the medical opinions and all of the prior administrative medical findings in [the claimant's] case record." *Id*. at §§ 404.1520c(b), 416.920c(b).

In the present case, the ALJ found the opinions of Dr. Cornejo and Dr. Lazarus "somewhat persuasive" at step two of the sequential evaluation,[5] as follows:

> As for the opinion evidence in regards to her nonsevere impairments, at the consultative internal medicine examination, physical examination showed full

---

[5] Plaintiff challenges the ALJ's consideration of these opinions at step two, arguing the ALJ's error resulted in a flawed RFC. *Plaintiff's Memorandum of Law*, ECF No. 8, pp. 19–20; *Plaintiff's Reply Brief*, ECF No. 11, pp. 3–4.

range of motion of the lumbosacral spine with no significant tenderness or spasms, normal lordotic curve and no back pain or radicular symptoms with sitting or supine straight leg raising maneuvers. In addition, she was able to walk with a normal gait and able to heel walk, toe walk and squat without difficulty. Imaging studies of the lumbar spine, performed on October 15, 2019, revealed moderate disc space narrowing at L4-5 and L5-S1 with minimal anterior osteophytes and facet arthrosis at L4 and L5. Although she was diagnosed with lumbar degenerative disc disease, Dr. Cornejo opined no significant limitations in walking, standing or sitting (Exhibit 8F).

On October 16, 2019, the claimant presented to a consultative psychiatric [sic] evaluation, performed by Lewis A. Lazarus, Ph.D., and reported that she drove self and attended alone. She reported working as a property manager, but there was a new owner and she was let go in March 2016. She reported taking prescribed psychotropic medications, but denied any psychiatric hospitalizations, saw a therapist about six years ago and did not attend any current mental health treatment. She reported feeling dysphoric and sad for the past few years due to medical issues and mothers' deteriorating condition with feelings of hopelessness, worthlessness and fatigue. She reported difficulty sleeping, excessive worrying and panic symptoms, which did not occur very often, as well as recent memory difficulties. Mental status evaluation demonstrated that the claimant appeared cooperative, friendly, adequate social skills and showed normal gait, posture and motor behavior. In addition, she had appropriate eye contact, fluent speech, coherent thought processes, affect was dysphoric, mood described as okay and reportedly, only a little nervous. Specialized testing showed mildly compromised memory skills, fair attention and concentration, average intellectual functioning and showed fair to good insight/judgment. The claimant further reported that she struggled with shortness of breath, fatigued easily and did not typically shop. However, she was able to care for her own daily personal hygiene, cook and prepare basic meals, able to manage medications, able to drive and kept in touch with friends. She was close to family members, enjoyed reading, watching television and spent the day trying to do something around the house. The claimant was diagnosed with chronic adjustment disorder with mixed anxiety and depressed moods. Dr. Lazarus recommended individual counseling and medical follow-up, especially due to cardiac disease and never underwent cardiac rehabilitation. Her prognosis was fair to guarded, largely dependent upon her underlying medical issues and opined that vocational assessment and rehabilitation may be somewhat problematic because of her underlying medical issues. However, she was considered capable of effectively managing own funds (Exhibit 9F).

Drs. Coenejo [sic] and Lazarus' opinions are somewhat persuasive, as these are examining physicians with specific program knowledge, opinions are consistent with the record and supported by essentially normal objective clinical findings, specialized testing and extensive mental status evaluation.

R. 26–27. The ALJ again considered Dr. Cornejo's opinion at step four,[6] when making the RFC

determination, and found that opinion "somewhat persuasive":

> The claimant presented to a consultative internal medicine examination on October
> 11, 2019, performed by Juan Carlos Cornejo, D.O., and reported that she applied
> for disability benefits for conditions such as congestive heart failure and
> hypertension. She reported swelling of legs at times, has a pacemaker and despite
> echocardiogram in 2019 showing ejection fraction of 30 to 35%, denied any chest
> pain. She reported difficulties with walking, pushing, pulling and climbing. She
> also had restrictions in activities of daily living with inability to perform light
> cleaning. However, she was able to go to a store by self, could do laundry, feed
> self, prepare simple meals, dress self and able to care for personal needs by self. In
> addition, she was able to climb up and down a few steps and walk a block. Vital
> signs showed a blood pressure reading of 142/90. Upon examination, the claimant
> appeared well-nourished, no acute distress, comfortable in a seated position, able
> to get on and off the examination table and able to dress by self. Cardiovascular
> examination showed regular rate and sinus rhythm, no murmurs and normal pulses.
> She had full range of motion of the upper and lower extremities bilaterally with full
> and equal muscle strength, intact sensations, no back pain, normal gait and able to
> heel walk, toe walk and squat without difficulty. In addition, she was cooperative
> with normal mood, affect, concentration, thought content and intact memory. The
> examiner diagnosed the claimant with congestive heart failure and hypertension.
> Dr. Cornejo reported that the claimant showed no significant fatigue during
> examination with good fine and gross manipulation and opined no significant
> impairment in gait, station or ambulation. *She was not limited from
> walking/standing with reasonable breaks, able to sit for a reasonable amount of
> time with breaks, no significant balance limitations and showed good functionality
> of bilateral hands. She would have difficulties with physically exerting activity,
> difficulty with heavy lifting and would be able to perform sedentary activities*
> (Exhibit 8F).
>
> Dr. Cornejo's opinion is somewhat persuasive, as this is an examining physician
> with specific program knowledge, opinion is consistent with the record and
> supported by extensive physical examination and objective clinical findings.

R. 33 (emphasis added).

---

[6] Although Plaintiff does not expressly cite to the record page that contains the ALJ's
consideration of Dr. Cornejo's opinion at step four, *Plaintiff's Memorandum of Law*, ECF No. 8,
pp. 19–20 (citing R. 27, not R. 33); *Plaintiff's Reply Brief*, ECF No. 11, pp. 3–4 (same), the
Court includes this step four discussion because Plaintiff challenges the ALJ's consideration
based in part on the purported failure to include Dr. Cornejo's "needed breaks" in the RFC. *See
id*.

In challenging the ALJ's consideration of these opinions, Plaintiff argues that the ALJ did not explain why the opinions were not entitled to full weight when the sources are examining physicians with specific program knowledge, and their opinions are consistent with the record, and are supported by essentially normal objective clinical findings, specialized testing, and extensive mental status evaluations. *Plaintiff's Memorandum of Law*, ECF No. 8, pp. 19–20; *Plaintiff's Reply Brief*, ECF No. 11, pp. 3–4. Plaintiff specifically contends that the ALJ's error in this regard requires remand because the ALJ's RFC determination does not reflect Dr. Lazarus' opinion that "[v]ocational assessment and rehabilitation may be somewhat problematic" and Dr. Cornejo's opinion that Plaintiff could perform "sedentary activity with needed breaks." *Id*.; *see also* R. 666, 674.

The Court is not persuaded that this issue requires remand. Even assuming—without holding—that the ALJ erred in failing to better explain his consideration of these opinions or that he should have found these opinions fully persuasive, any such failure in this regard is harmless. Dr. Lazarus' opinion that "[v]ocational assessment and rehabilitation *may be somewhat problematic*[,]" R. 674 (emphasis added), is speculative, vague, and contains no functional limitations. Any error by the ALJ in his consideration of this opinion, if indeed any error occurred, does not require remand. *See Pierznik v. Comm'r Soc. Sec.*, No. 22-2369, 2023 WL 4014468, at *1 (3d Cir. June 15, 2023), *cert. denied sub nom. Pierznik v. O'Malley*, No. 23-6428, 2024 WL 899292 (U.S. Mar. 4, 2024) (concluding that substantial evidence supported the RFC determination and the ALJ's underlying decision to reject some medical opinions because they were "vague" and did not address the claimant's functional abilities in vocational terms).

Plaintiff's reliance on Dr. Cornejo's opinion that Plaintiff could perform "sedentary activity with needed breaks[,]" R. 666, is similarly unavailing. To the extent that Plaintiff

contends that the RFC does not accommodate "needed breaks[,]" this Court disagrees. As discussed above, Dr. Cornejo did not specify the kind of breaks that Plaintiff needed. *Id*. However, reading his opinion in context, Dr. Cornejo's statements that Plaintiff "would not be limited from walking and standing with reasonable breaks" and that she "would be able to sit for a reasonable amount [of] time with needed breaks" reflects that the "needed breaks" to which he referred would consist of a break from walking, standing, and sitting. *See id*. Here, the ALJ's RFC permits, *inter alia*, an ability "to change positions for comfort without being off task." R. 29, 666. To the extent that Plaintiff suggests that Dr. Cornejo's opinion requires some kind of different break, *i.e.*, a mental break of being off task, a break of specific duration, and/or a break with specific frequency, Plaintiff's contention in this regard is purely speculative. This Court concludes that the ALJ's RFC determination sufficiently accommodates Dr. Cornejo's opinion. Accordingly, Plaintiff has not persuaded this Court that the failure to include any different or additional RFC limitations arising from Dr. Cornejo's reference to "needed breaks" requires remand. *Cf. Kerdman v. Comm'r of Soc. Sec.*, 607 F. App'x 141, 144 (3d Cir. 2015) ("[S]ubstantial evidence supports the ALJ's conclusion that Dr. Frank's opinion was not well-supported, as Dr. Frank failed to reference any objective medical evidence supporting his statements of disability or articulate any specific functional limitations suffered by [the claimant].").

Plaintiff also complains that the ALJ improperly discounted her cardiovascular condition by "citing to mostly records that predate the alleged onset date" of November 1, 2018. *Plaintiff's Memorandum of Law*, ECF No. 8, pp. 20–21 (citing R. 30, which, in turn, cites to R. 474 (containing records from February 2018), 477 (same), 480 (same), 537 (reflecting a record from July 2018)). The Court is not persuaded that this issue requires remand. The ALJ "may consider"

this evidence even though such evidence is not entitled to any particular weight. *See Louis v. Comm'r Soc. Sec.*, 808 F. App'x 114, 120 (3d Cir. 2020) (citing *Pirtle v. Astrue*, 479 F.3d 931, 934 (8th Cir. 2007)). In any event, the ALJ went on to consider objective medical and opinion evidence dated after the alleged disability onset date which, as detailed above, reflected, *inter alia*, normal cardiovascular findings, no evidence of edema, finding of stable nonischemic cardiomyopathy, and Plaintiff's denials of chest pain, palpitations, ICD shocks, or leg swelling. R. 31–34 (considering evidence dated from December 2018 through January 2020).

Plaintiff also argues that "the record documents symptoms consistent with the Plaintiff's diagnoses that were not properly considered in the RFC finding[,]" including Plaintiff's testimony that "she always feels out of breath," she suffers from lack of sleep that leads to daytime fatigue, and ankle swelling. *Plaintiff's Memorandum of Law*, ECF No. 8, p. 27 (citations omitted). Plaintiff specifically complains that, despite this evidence, the ALJ erred in failing to discuss the impact of Plaintiff's fatigue, lack of sleep, and shortness of breath on her ability to maintain persistence and pace. *Id*. This argument is not well taken.

"Subjective allegations of pain or other symptoms cannot alone establish a disability." *Miller v. Comm'r of Soc. Sec.*, 719 F. App'x 130, 134 (3d Cir. 2017) (citing 20 C.F.R. § 416.929(a)). Instead, the record must reflect objective medical evidence corroborating a claimant's subjective complaints. *Prokopick v. Comm'r of Soc. Sec.*, 272 F. App'x 196, 199 (3d Cir. 2008) (citing 20 C.F.R. § 404.1529(a)). Specifically, an ALJ must follow a two-step process in evaluating a claimant's subjective complaints. SSR 16-3p, 2017 WL 5180304 (Oct. 25, 2017). First, the ALJ "must consider whether there is an underlying medically determinable physical or mental impairment(s) that could reasonably be expected to produce an individual's symptoms, such as pain." *Id*. "Second, once an underlying physical or mental impairment(s) that could

24

reasonably be expected to produce an individual's symptoms is established, [the ALJ] evaluate[s] the intensity and persistence of those symptoms to determine the extent to which the symptoms limit an individual's ability to perform work-related activities[.]" *Id.*; *see also Hartranft v. Apfel*, 181 F.3d 358, 362 (3d Cir. 1999) ("[Evaluation of the intensity and persistence of the pain or symptom and the extent to which it affects the ability to work] obviously requires the ALJ to determine the extent to which a claimant is accurately stating the degree of pain or the extent to which he or she is disabled by it.") (citing 20 C.F.R. § 404.1529(c)). In conducting this evaluation, an ALJ must consider the objective medical evidence as well as other evidence relevant to a claimant's subjective symptoms. 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3) (listing the following factors to consider: daily activities; the location, duration, frequency, and intensity of pain or other symptoms; precipitating and aggravating factors; the type, dosage, effectiveness, and side effects of any medication you take or have taken to alleviate pain or other symptoms; treatment, other than medication, currently received or have received for relief of pain or other symptoms; any measures currently used or have used to relieve pain or other symptoms; and other factors concerning your functional limitations and restrictions due to pain or other symptoms). Finally, an "ALJ has wide discretion to weigh the claimant's subjective complaints, *Van Horn v. Schweiker*, 717 F.2d 871, 873 (3d Cir. 1983), and may discount them where they are unsupported by other relevant objective evidence." *Miller*, 719 F. App'x at 134 (citing 20 C.F.R. § 416.929(c)); *see also Izzo v. Comm'r of Soc. Sec.,* 186 F. App'x 280, 286 (3d Cir. 2006) ("[A] reviewing court typically defers to an ALJ's credibility determination so long as there is a sufficient basis for the ALJ's decision to discredit a witness.").

In the present case, the ALJ followed this two-step evaluation process. The ALJ

specifically considered Plaintiff's subjective complaints. R. 30, 33–34. The ALJ found that

Plaintiff's medically determinable impairments could reasonably be expected to cause

symptoms, but that Plaintiff's statements "concerning the intensity, persistence and limiting

effects of these symptoms are not entirely consistent with the medical evidence and other

evidence in the record for the reasons explained in this decision." R. 30. As previously discussed,

the ALJ detailed years of medical evidence and record testimony to support his findings. R. 29–

34. Notably, the ALJ expressly considered Plaintiff's allegations of fatigue, R. 30–31, lack of

sleep and difficulty sleeping, R. 30, shortness of breath, R. 29–32, and ankle swelling, R. 30.

However, the ALJ properly discounted the severity of Plaintiff's subjective complaints when

considering, *inter alia*, that Plaintiff at times denied shortness of breath and ankle swelling; did

not feel short of breath when shopping and felt only mildly short of breath with housework and

climbing one flight of stairs; did not appear significantly fatigued upon examination by Dr.

Cornejo; and in January 2020, Plaintiff reported that she was able to exercise for 45 minutes and

climb stairs without restriction. R. 30–34. In the view of this Court, this record provides

substantial support for the ALJ's discount of Plaintiff's subjective statements as inconsistent with

the record evidence. *See Van Horn*, 717 F.2d at 873; *Miller*, 719 F. App'x at 134; *Izzo*, 186 F.

App'x at 286. Accordingly, the ALJ did not err by not including additional RFC limitations

regarding Plaintiff's ability to maintain persistence or pace.

     Plaintiff also argues that the ALJ improperly cherry-picked certain statements and used

them inconsistently in the decision. *Plaintiff's Memorandum of Law*, ECF No. 8, pp. 27–28.

Plaintiff specifically argues that the ALJ erred in relying "heavily on her conclusions that the

Plaintiff could perform household chores, prepare meals, shop, handle self-care/personal[ ]

hygiene, and perform other activities of daily living[,]" while later acknowledging contrary

evidence in the Function Reports and Plaintiff's testimony that she could not perform these activities:

> [T]he ALJ states that the Plaintiff had 'problems with performing activities of daily living and is unable to adequately care for her personal needs (Exhibit 6E).' (R. 29-30). She acknowledged the Plaintiff's testimony that she was unable to blow-dry her hair, that her boyfriend did the shopping and cooking, and that she required help from her daughter to do the laundry. It remains unclear to subsequent reviewers how the ALJ could have found that the Plaintiff was capable of these activities of daily living at Step 2 when discounting the impact of the Plaintiff's mental health impairments, but then acknowledges the presence of these limitations later in the decision. In summary, it is respectfully submitted that the ALJ's failure to properly consider the Plaintiff's statements in a consistent manner throughout the decision violates SSR 16-3p and contributes to further harmful error in this matter warranting remand.

*Id*. The Court is not persuaded this issue requires remand. The ALJ reasonably considered at step two that that Plaintiff herself reported that she was able to perform a variety of daily activities, including her ability to handle matters of personal hygiene and self-care. R. 28 (noting that "*the claimant also stated that she could perform* some household chores, prepare meals, pay bills, attends medical appointments, take medications[,] shop and drive"; "*the claimant said that she is also able* to drive, prepare meals, watches television, read, manage funds, use the internet and handle her own medical care"; "*the claimant also stated that she is able* to do handle self-care, personal hygiene and get along with caregivers") (emphasis added). At step four, the ALJ again considered Plaintiff's subjective allegations regarding her daily activities, as follows:

> The claimant *alleged* an inability to work due to multiple cardiovascular disorders with shortness of breath upon exertion and at rest (*Exhibit 3E*) [Disability Report]. Due to her conditions, she had problems with performing activities of daily living and unable to adequately care for her personal needs (*Exhibit 6E*) [Disability Report]. . . . At [the] hearing, . . . [s]he *reported* that her daughter would blow-dry her hair and boyfriend went grocery shopping and did the cooking. . . . However, she was able to drive without any limitations, able to read, write and do math, able to care for daily personal needs, did dishes, light dusting and did laundry with assistance from her daughter (*Testimony*).

R. 29–30 (emphasis added). As previously explained, the ALJ discounted Plaintiff's subjective

27

statements regarding the intensity, persistence, and limiting effects of her symptoms as not entirely consistent with the record evidence. R. 29–34. Plaintiff now appears to ask this Court to remand the matter because the ALJ noted inconsistencies in Plaintiff's testimony or, alternatively, to re-weigh Plaintiff's testimony. That request is not well taken. As explained above, an ALJ has wide discretion to consider a claimant's subjective complaints. *See Van Horn*, 717 F.2d at 873; *Miller*, 719 F. App'x at 134; *Izzo,* 186 F. App'x at 286. Moreover, the Court "will uphold the ALJ's decision even if there is contrary evidence that would justify the opposite conclusion, as long as the 'substantial evidence' standard is satisfied." *Johnson v. Comm'r of Soc. Sec.*, 497 F. App'x 199, 201 (3d Cir. 2012) (citing *Simmonds v. Heckler*, 807 F.2d 54, 58 (3d Cir. 1986)); *see also Chandler*, 667 F.3d at 359 ("Courts are not permitted to reweigh the evidence or impose their own factual determinations [under the substantial evidence standard]."); *Hatton v. Comm'r of Soc. Sec. Admin.*, 131 F. App'x 877, 880 (3d Cir. 2005) ("When 'presented with the not uncommon situation of conflicting medical evidence . . . [t]he trier of fact has the duty to resolve that conflict.'") (quoting *Richardson v. Perales*, 402 U.S. 389, 399 (1971)). Accordingly, this Court concludes that the ALJ did not engage in impermissible cherry picking or otherwise rely inconsistently on Plaintiff's subjective statements.

In short, for all these reasons, the Court concludes that the ALJ's findings regarding Plaintiff's RFC are consistent with the record evidence and enjoy substantial support in the record, as does his consideration of the opinions of Dr. Lazarus and Dr. Cornejo.

## B.      Step Five

Plaintiff also challenges the ALJ's step five determination, arguing that the Commissioner failed to carry his burden at that stage because the ALJ failed to provide the required transferable skills analysis as set forth in the Agency's Program Operations Manual

System ("POMS"). *Plaintiff's Memorandum of Law*, ECF No. 8, pp. 8–17; *Plaintiff's Reply Brief*, ECF No. 11, pp. 1–3 (arguing, *inter alia*, that SSR 82-41 explains the concept of transferability and "summarizes the very same factors outlined in the POMS"). Plaintiff specifically argues that a proper analysis would establish that there are no transferable skills that Plaintiff has acquired from her past relevant work that could be applied to other work at step five. *Id*. For the reasons that follow, Plaintiff's arguments are not well taken.

At step five, an ALJ must decide whether the claimant, considering the claimant's RFC and vocational profile, can perform other jobs that exist in significant numbers in the national economy. 20 C.F.R. §§ 404.1520(g), 416.920(g). Unlike at the first four steps of the sequential evaluation, the Commissioner bears the burden of proof at step five. *Hess v. Comm'r Soc. Sec.*, 931 F.3d 198, 201 (3d Cir. 2019); *Johnson v. Comm'r of Soc. Sec.*, 529 F.3d 198, 205 (3d Cir. 2008) (citing *Rutherford v. Barnhart*, 399 F.3d 546, 551 (3d Cir. 2005)).

Claims that require an ALJ to consider "an applicant's ability to adjust to other work are addressed in the last step of the sequential evaluation process[.]" SSR 82-41, 1982 WL 31389, at *1. The transferability of skills "is an issue only when an individual's impairment(s), though severe, does not meet or equal" a listed impairment but prevents "the performance of past relevant work . . . , and that work has been determined to be skilled or semiskilled." *Id*. "A skill is knowledge of a work activity which requires the exercise of significant judgment that goes beyond the carrying out of simple job duties and is acquired through performance of an occupation which is above the unskilled level (requires more than 30 days to learn)." *Id*. at *2 (explaining further that a skill "is practical and familiar knowledge of the principles and processes of an art, science or trade, combined with the ability to apply them in practice in a proper and approved manner"). "Transferability means applying work skills which a person has

demonstrated in vocationally relevant past jobs to meet the requirements of other skilled or semiskilled jobs." *Id*. It follows that "transferable skills" are "skills that can be used in other jobs, when the skilled or semi-skilled work activities [a claimant] did in past work can be used to meet the requirements of skilled or semi-skilled work activities of other jobs or kinds of work." 20 C.F.R. §§ 404.1568(d)(1), 416.968(d)(1). "This depends largely on the similarity of occupationally significant work activities among different jobs." *Id*. When considering whether work exists in the national economy that exists in significant numbers, Social Security regulations authorize an ALJ to use a vocational expert to determine whether a claimant has transferable work skills from past relevant work. *See* 20 C.F.R. §§ 404.1566(e) ("If the issue in determining whether [a claimant] is disabled is whether [a claimant's] work skills can be used in other work and the specific occupations in which they can be used . . . [an ALJ] may use the services of a vocational expert."), 416.966(e) (same). "When a finding is made that a claimant has transferable skills: (1) the acquired work skills must be identified, (2) the specific occupations to which the acquired work skills are transferable must be cited, and (3) evidence that these specific skilled or semi-skilled jobs exist in significant numbers in the national economy should be included." *Gaddis v. Comm'r of Soc. Sec.*, 417 F. App'x 106, 107–08 (3d Cir. 2011) (citing SSR 82-41)).

In the present case, the ALJ determined that Plaintiff was unable to perform her past relevant work as a property manager, explaining as follows:

> The claimant has past relevant work as a property manager, which satisfies the requirements to constitute past relevant work (20 CFR 404.1565(a) and 416.965(a) and SSR 82-62). The claimant performed this job within the past 15 years, performed it long enough to learn and performed at substantial gainful levels (Exhibits 3D, 4D and 3E). She described this position as assisting senior property manager, accounts receivable/payable, customer billing, building inspections, filing, oversaw performance of vendor services, boxing and storing old files and handled customer requests. She used machines or equipment, used technical

knowledge or skills and completed reports or similar duties. She frequently lifted 30 pounds, heaviest weight she lifted was 50 pounds and that she supervised 10 other people eight hours a day (Exhibit 5F, pp. 16-18). More specifically, her job title was assistant property manager and performed tasks associated with the management office and administrative procedures. She performed telephone duties, file setup and retention, office supply purchasing, tenant billings, vendor invoice reviews, coding, payment, dispatching work orders, office equipment purchasing and maintenance. In addition, she performed regular property inspections, prepared tenant billing and collected receivables, assisted in monthly accruals and financials, prepared monthly reports, prepared contracts, processed invoices and participated in evaluations of building systems (Exhibit 17E). At hearing, the claimant testified that she worked as a property manager from 1995 through 2016 and handled complaints of tenants, maintenance staff, walked the building, tenant inspections, fire inspections, construction, answered phones, filing, stored files every three months and performed normal secretarial administration duties (Testimony).

The vocational expert testified that the claimant's past work as a property manager is located in the Dictionary of Occupational Titles (DOT) at #186.167.046, has a Specific Vocational Preparation (SVP) of 8, which is indicative of skilled work, and normally performed at the light exertional level. Based on the residual functional capacity described above, the vocational expert further testified that the claimant was unable to perform past work as a property manager due to exertional demands (Testimony).

Accordingly, the undersigned Administrative Law Judge finds that the claimant is unable to perform past relevant work as actually or generally performed.

R. 34. The ALJ went on to find that Plaintiff had acquired work skills from her past relevant work: "The vocational expert testified that the claimant's past relevant work as property manager was skilled with a specific vocational preparation (SVP) code of 8 and required the following skills: *basic accounting, typing and purchasing* (Testimony)." R. 35 (emphasis added). The ALJ also found that, considering Plaintiff's age, education, work experience, and RFC, Plaintiff had acquired work skills from her past relevant work that were transferable to other occupations with jobs existing in significant number in the national economy, as follows:

In determining whether a successful adjustment to other work can be made, the undersigned must consider the claimant's residual functional capacity, age, education, and work experience in conjunction with the Medical-Vocational Guidelines, 20 CFR Part 404, Subpart P, Appendix 2. If the claimant can perform

all or substantially all of the exertional demands at a given level of exertion, the medical-vocational rules direct a conclusion of either "disabled" or "not disabled" depending upon the claimant's specific vocational profile (SSR 83-11). When the claimant cannot perform substantially all of the exertional demands of work at a given level of exertion and/or has nonexertional limitations, the medical-vocational rules are used as a framework for decisionmaking unless there is a rule that directs a conclusion of "disabled" without considering the additional exertional and/or nonexertional limitations (SSRs 83-12 and 83-14). If the claimant has solely nonexertional limitations, section 204.00 in the Medical-Vocational Guidelines provides a framework for decision-making (SSR 85-15).

The vocational expert was asked if any occupations exist which could be performed by an individual with the same age, education, past relevant work experience, and residual functional capacity as the claimant, and which require skills acquired in the claimant's past relevant work but no additional skills. The vocational expert responded and testified that representative occupations such an individual could perform include:

1. a data entry clerk, DOT #203.582-054, has an SVP of 4, which is indicative of semiskilled work, performed at the sedentary exertional level and exists in significant numbers in the national economy with 64,000 positions;

2. a procurement clerk, DOT #249.367-066, has an SVP of 4, performed at the sedentary exertional level and exists in significant numbers in the national economy with 33,000 positions;

3. and as an accounting clerk, DOT #216.482-010, has an SVP of 5, performed at the sedentary exertional level and exists in significant numbers in the national economy with 672,000 positions (Testimony).

Pursuant to SSR 00-4p, the undersigned has determined that the vocational expert's testimony is consistent with the information contained in the Dictionary of Occupational Titles, as well as extensive personal experience in the vocational field.

Accordingly, although the claimant's additional limitations do not allow the claimant to perform the full range of sedentary work, considering the claimant's age, education and transferable work skills, a finding of "not disabled" is appropriate under the framework of Medical-Vocational Rule 201.15 and SSRs 83-10, 83-14 and 85-15.

R. 35–36. The ALJ therefore concluded that Plaintiff has not been under a disability from

November 1, 2018, her alleged disability onset date, through the date of the decision. R. 36.

This analysis reflects that the ALJ properly considered the transferability of Plaintiff's skills from her past relevant work. As detailed above, the ALJ, relying on vocational expert testimony, identified Plaintiff's acquired work skills as basic accounting, typing, and purchasing. R. 35; *see also Gaddis*, 417 F. App'x at 108; SSR 82-41, 1982 WL 31389, at *7. The ALJ next cited to the specific occupations of data entry clerk, procurement clerk, and accounting clerk, to which Plaintiff's acquired work skills are transferable. R. 35 (citing vocational expert testimony); *see also Gaddis*, 417 F. App'x at 108; SSR 82-41, 1982 WL 31389, at *7. Finally, the ALJ relied on vocational expert testimony to find that these three jobs existed in significant numbers in the national economy. R. 35; *see also* R. 69 (reflecting vocational expert testimony regarding the number of these jobs available in the national economy); *Gaddis*, 417 F. App'x at 108; SSR 82-41, 1982 WL 31389, at *7. The Court finds no error in the ALJ's findings in this regard. *See Gaddis*, 417 F. App'x at 108; SSR 82-41, 1982 WL 31389, at *7.

Plaintiff, however, challenges these findings. As a preliminary matter, Plaintiff's assertion that remand is required because the ALJ purportedly failed to comply with certain POMS provisions, *Plaintiff's Memorandum of Law*, ECF No. 8, pp. 8–17, is unavailing. POMS "lack the force of law and create no judicially-enforceable rights." *Bordes v. Comm'r of Soc. Sec.*, 235 F. App'x 853, 859 (3d Cir. 2007); *see also Edelman v. Comm'r of Soc. Sec.*, 83 F.3d 68, 71 n.2 (3d Cir. 1996) ("These regulations [POMS] do not have the force of law.") (citing *Schweiker v. Hansen*, 450 U.S. 785, 789 (1981)). To the extent that Plaintiff argues in reply that SSR 82-41 "summarizes the same factors outlined in POMS" and that the ALJ failed to comply with that regulation, *Plaintiff's Reply Brief*, ECF No. 11, p. 1, this Court has already explained its conclusion that the ALJ complied with SSR 82-41.

Plaintiff also challenges the ALJ's finding that Plaintiff had three acquired work skills, arguing that the hearing testimony confirms that neither accounting nor purchasing was a skill acquired by Plaintiff in her past relevant work, thus invalidating the jobs of procurement clerk and accounting clerk. *Plaintiff's Memorandum of Law*, ECF No. 8, pp. 13–14 (citations omitted). Even assuming—without holding—that Plaintiff did not acquire those work skills and that the jobs of procurement clerk and accounting clerk were not available to her, there nevertheless remains the acquired work skill of typing. R. 35. However, Plaintiff also challenges this skill by arguing that "the vocational expert did not confirm with certainty that typing was actually an acquired skill[.]" *Plaintiff's Memorandum of Law*, ECF No. 8, p. 13 (citing R. 68, 75–76).To the contrary, the vocational expert, after listening to additional testimony from Plaintiff, confirmed that typing was a transferrable skill acquired by Plaintiff during the course of her past relevant work. R. 77. The vocational expert also confirmed that the job of data entry clerk would still be available to Plaintiff with only typing as an acquired transferable skill. *Id*. Notably, an "ALJ need only establish that a claimant is capable of performing one job that exists in significant numbers in the national economy." *Pierznik*, 2023 WL 4014468, at *2; *see also* 20 C.F.R. §§ 404.1566 ("Work exists in the national economy when there is a significant number of jobs (in *one* or more occupations) having requirements which you are able to meet with your physical or mental abilities and vocational qualifications.") (emphasis added), 416.966 (same); *cf. Young v. Astrue*, 519 F. App'x 769, 772 (3d Cir. 2013) ("[T]here is no precise estimate for what constitutes 'significant numbers' of jobs under the Social Security Act.") (citing 20 C.F.R. § 404.1566); *Ahmad v. Comm'r of Soc. Sec.*, 531 F. App'x 275, 278 (3d Cir. 2013) ("In light of our determination in *Craigie v. Bowen*, 835 F.2d 56, 58 (3d Cir. 1987), that 200 jobs in the regional economy was a 'clear indication' that other meaningful work in the national economy existed,

we conclude that the ALJ did not err by concluding that the 569 jobs available as a surveillance system monitor was evidence of other work in significant numbers in the national economy."). Accordingly, based on this record, the Commissioner met the burden at step five by showing that at least one job—*i.e.*, data entry clerk—existed in significant numbers in the national economy and which Plaintiff could perform. *See id.*

Plaintiff goes on to argue that the codes for Plaintiff's past relevant and the jobs identified by the vocational expert do "not match" and that the ALJ was not permitted to rely on the vocational expert's testimony because "it is clear that there does not exist sufficient similarity [between Plaintiff's past relevant work and the three jobs identified by the vocational expert] to allow for successful transfer of skills[.]" *Plaintiff's Memorandum of Law*, ECF No. 8, pp. 15–16; *Plaintiff's Reply Brief*, ECF No. 11, pp. 2–3. The Court is not persuaded that remand is required on this basis. "[W]here job skills have universal applicability across industry lines, *e.g.*, *clerical*, professional, administrative, or managerial types of jobs, *transferability of skills to industries differing from past work experience can usually be accomplished with very little, if any, vocational adjustment where jobs with similar skills can be identified as being within an individual's RFC.*" SSR 82-41, 1982 WL 31389, at *6 (emphasis added); *see also id.* at *3 (referring to "*typing*, filing, tabulating and posting data in record books, preparing invoices and statements, operating adding and calculating machines" as "clerical skills") (emphasis added). Accordingly, where the vocational expert testified that typing was an acquired transferable skill, transferability was appropriate between Plaintiff's past relevant work as a property manager, which required a skill level of 8, and at least one of the three jobs identified by the vocational expert, *i.e.*, data entry clerk, which required a skill level of 4. *Id.*; *see also* R. 35, 69, 77; *Biestek*, 139 S. Ct. at 1155 (stating that "a vocational expert's testimony may count as substantial

35

evidence"); 20 C.F.R. §§ 404.1568(d)(2) (stating that transferability "is most probable and meaningful among jobs" that have "(i) *The same or a lesser degree of skill is required*; (ii) The same or similar tools and machines are used; and (iii) The same or similar raw materials, products, processes, or services are involved.") (emphasis added), 416.968(d)(2) (same); 404.1568(d)(3) ("A complete similarly of all three factors [from subsection (d)(2)] is not necessary for transferability."), 416.968(d)(3) (same). The Court therefore declines Plaintiff's invitation to reweigh the vocational expert testimony in favor of Plaintiff's interpretation of the job codes. *See Chandler*, 667 F.3d at 359.

## VI.    CONCLUSION

For all these reasons, the Court **AFFIRMS** the Commissioner's decision.

The Court will issue a separate Order issuing final judgment pursuant to Sentence 4 of 42 U.S.C. § 405(g).

**IT IS SO ORDERED.**


Date:  April 25, 2024                             *s/Norah McCann King*
                                          NORAH McCANN KING
                                          UNITED STATES MAGISTRATE JUDGE